## ANDRADE v. SOUTHERN PINE LUMBER CO.

No. 2900.

Court of Civil Appeals of Texas. Beaumont.

May 18, 1936.

Rehearing Denied May 27, 1936.

Adams & McAlister, of Nacogdoches, for plaintiff in error.

J. J. Collins and R. E. Minton, both of Lufkin, and King, Wood & Morrow, and H. Earl Cox, all of Houston, for defendant in error.

WALKER, Chief Justice.

This was an action by plaintiff in error, C. Andrade, 3d, against Southern Pine Lumber Company, defendant in error, for damages for personal injuries received by him in a collision between his automobile and one of defendant in error's trucks. The jury found defendant in error guilty of the negligence charged in the petition, but also convicted plaintiff in error of contributory negligence. On the verdict of the jury judgment was entered against plaintiff in error. The verdict of the jury, on the issues mentioned above, has support in the evidence, but neither the negligence of defendant in error nor the contributory negligence of plaintiff in error was established as a matter of law.

Question No. 6, submitted to the jury, was as follows, answered as indicated: "What sum of money, if paid now in cash, will fairly and reasonably compensate plaintiff for the injuries sustained by him, if any, as a result of the collision?" Answer: "Nothing."

On the issue submitted to the jury by question No. 6, plaintiff in error testified as follows:

"I put the emergency brake on and it was almost impossible to unlock it afterwards, I had it pulled back as far as it would go. I guess I must have been knocked out for the space of a few seconds immediately after the accident; I had some feeling that the car was going to catch fire and I couldn't get out of it. Both doors had been knocked off and it had knocked one of the lights over on the side and put a dent in the top of the car with my shoulder or head, I don't know which it was, and this was a steel car all over, steel top, and I noticed some people standing about a hundred yards or a hundred feet, they were near up to the car, and I yelled for somebody to come and help me out of the car. They came up and got me out of the car and laid me down on

the ground there opposite the road, and they put some water on my head and did the best they could for me and two fellows came along the road and carried me to the hospital at Nacogdoches. * * * I remember going to Nacogdoches; I mean I knew I was going on a road; I was just knocked out for a short time there. They took me to the hospital there—I forget the name of it—and Dr. Campbell was called right away. * * * I don't know the nurses names who nursed me, there were two of them; one of them was from Lufkin and I think another from Nacogdoches. I stayed in the hospital there about two days. I live in Dallas. I was carried from Nacogdoches to Dallas in an ambulance; Mr. Tucker was the man's name who had the ambulance. When we reached Dallas I was taken to my home, to my bed-room. I remained in bed about ten or twelve days, and stayed around the house for two and a half or three weeks practically all the time. The doctors who attended me at that time were Dr. Tittle of the Dallas Medical and Surgical Clinic, and Dr. Houston Terry of Fort Worth. * * * After I got up—about three weeks after the accident I went back to the office and did a little work. I started going to the office regularly probably four or five weeks after the accident.

"I judge I had thirty or forty bruises all over the lower part of my body, practically every bit. The thing that hurt me most was right here in my left—just here—that was the steering wheel, when the car wrecked the steering wheel was pushed down over and hit me here. There was a large black and blue or green bruise—had all kinds of colors to it; and then I had some—when I took a breath, not even a deep breath but a little breath, breathe a little more than ordinary—I would have a catching pain in here. Then I had a bad bruise right on my right hip—the lower part here. And my leg—my right leg—was cut in two places. And I hit my head on the thing—the car when it turned over—and hit against the ceiling and knocked it about eleven inches. I must have hit it about like this, some way, with my shoulder and head together, and I have had pains in there, and had that all the time since then. There were no breaks in the skin; it had a big knot there. * * *

"Since the injuries I have had pains that I never had before. Immediately following the accident I had pains all over my body— sore in every place, particularly here, and sharp pain in my head and some pain in my back; this place hurt me most, where it was bruised; some of the bruises didn't hurt me much after a few days. I haven't had hardly any pain in my chest for ten months I guess. The result or peculiarity of my head injury is that, at night I used to sleep pretty soundly, and I do not sleep soundly now, and I have headaches now and never had a headache before in my life. Now I take aspirin for headaches, and do it continuously since the accident, and when I sit in one position very long I have got to move around a little or it starts to hurting in the small of my back. That condition has continued throughout the injury up to now. I wake up at night and have these sweats and am all wet around the top part of my body.

"I am in the oil business, and since the accident I haven't felt much like driving myself, I am really afraid, I lose my nerves, when anybody else is driving, but I have a fellow to drive for me a good portion of the time, for he has—I have a good deal of confidence in him—and when he has not been available I have other people to drive me. I can't attend to business as well now as I could before the accident. When a man has headaches like I have he can't get rest and sleep; of course, some nights I sleep all right, I don't have them every night, but when it hurts me I can't attend to my business like I used to attend to it. My company's work—they had production in East Texas, and a little production at Conroe, and they were doing a little drilling from time to time in different parts of the state, and it is my duty to see that the drilling is properly done, and to purchase the necessary equipment that had to be purchased for the Company to handle the well—all the purchases of leases and royalties—something like that—more or less of a general manager's job. Prior to September 13th of last year I had been doing that continuously for the last several years. I was able at all times to go from field to field and attend to my duties. I have not been able to go as much since the accident as I did before; I tire more easily and I just haven't been able to give the business the same attention I used to give it before the accident.

"Since the accident I have to employ various parties to drive me and I have to pay their expenses at hotels and rooming houses wherever we stop, in addition to compensating them for doing the driving. As to the effect of the wreck on my nervous system, as to whether I am even and tem-

perate as I was before it, or irritable, I don't like to class myself as being irritable; however, little things that would not upset me before upset me now. Driving a car does not produce the headaches; I don't know what causes the headaches to come; different influences I expect; I have had them ever since the accident occurred, but never before that, but why they come on I can't tell you; there is no regularity. When I stay at the house I am not as nervous as when I go out on the road; I suppose maybe the nervousness causes the headaches, I don't know about that.

"During 1933 I drew the salary of twenty thousand dollars. I don't know what my salary is going to be until 1934. In the last six months I have been drawing money against my personal account—they charge me with it. I haven't got any salary for 1934 yet. I would judge I spend monthly for this driver probably eighty to one hundred dollars; since I was not going on company business at the time of the wreck I think it would be up to me to recompense the company for it. I think the hospital bill at Nacogdoches was forty-five dollars. I paid Dr. Campbell thirty dollars. I paid fifty dollars for the ambulance which carried me to Dallas. I paid Dr. Tittle seventy-five dollars; I think up to now I have paid Dr. Terry four hundred dollars. I haven't received a bill for the last forty-five days. I thought those services were necessary or I would not have had the doctors."

The jury's answer to question No. 6 is contrary to all the testimony in the record. When the evidence on the issue of plaintiff in error's contributory negligence is weighed, it is reasonable to conclude that the same improper influence—whatever it was—that caused the jury to give its answer to question No. 6, also entered into its verdict convicting him of contributory negligence. On the adjudicated cases plaintiff in error has not had a fair trial. Clark v. Spurdis (Tex.Civ.App.) 258 S.W. 881, and the authorities therein cited.

The proposition that the court erred in refusing to strike certain depositions from the record is overruled; plaintiff in error's motion to strike was filed too late.

It follows that the judgment of the lower court should be reversed and the cause remanded for a new trial, and it is accordingly so ordered.

Reversed and remanded.

## On Rehearing.

■ Defendant in error suggests that our decision in this case is "quite novel." We merely invoked a principle as old as jurisprudence, that a party to litigation is entitled to a fair trial. In answerng question No. 6—the issue submitting the amount of damages suffered by plaintiff in error as a proximate result of the collision—the jury arbitrarily rejected all the evidence on that issue and found, "Nothing"; under the undisputed evidence the jury was compelled to find a substantial sum in answer to this question. Defendant in error would support this finding by the proposition that, having found plaintiff in error guilty of contributory negligence, the jury knew he could not be awarded any amount and so found by its verdict. That is not a reasonable construction of the facts of this record and is contrary to the law governing special issue submissions. On this proposition, speaking for the Supreme Court, in Monkey Grip Rubber Company v. Walton, 122 Tex. 185, 53 S.W.(2d) 770, 772, the Commission of Appeals said: "When a case is submitted on special issues, it is the duty of the jury to answer each special issue as the facts justify without regard to the effect of such finding upon the judgment to be thereafter rendered in the cause." It necessarily follows that some improper influence induced the jury to answer this question against all the evidence and contrary to the law.

■ Only by giving due effect to the principle that the jury is the judge of the credibility of the witnesses and the weight to be given their testimony, and that it had the legal right to *believe* the witnesses offered by defendant in error and to *reject* the testimony of the witnesses offered by plaintiff in error, could this court affirm the findings on the issue of contributory negligence. While the jury has the right to weigh and reject testimony, it does not have the right, acting arbitrarily, to reject any testimony, but it must *weigh* all testimony sent to it by the court and *judge* the credibility of the witnesses. Since it affirmatively appears that the jury arbitrarily rejected all evidence in support of issue No. 6 because, manifestly, of some prejudice against plaintiff in error, it is reasonable to conclude that the same improper influence entered into the findings on contributory negligence; that is, having arbitrarily rejected certain testimony going to the very heart of plain-

tiff in error's cause of action, the jury arbitrarily rejected all testimony offered by him on the trial.

█ On the facts of this case we are not in conflict, as defendant in error insists, with Osterloh v. San Antonio Public Service Company (Tex.Civ.App.) 77 S.W.(2d) 290, and Harrison v. Missouri, K. & T. Ry. Co. (Tex.Civ.App.) 89 S.W.(2d) 455. To sanction this verdict would write into our jurisprudence the principle that the jury can ignore the special issues submitted by the court and return a general verdict in violation of the court's charge; of course, the jury does not have that power.

The motion for rehearing is in all things overruled.